UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                       )
ORGANOGENESIS INC.,                    )
                                       )
            Appellant,                 )
      v.                               )      Case No. 04-CV-12549-RWZ
                                       )
JANE ANDREWS, KAREN A. GIAMPAOLO,      )
MARGARET HIRST, DINA KAZIS-PANICO,     )
HODA MANSOUR, JOHN G. O'BRIEN,         )
DANIEL O'REILLY, MARC P. PELLETIER,    )
JOHN C. RODRIGUES, JONATHAN E.         )
THAYER, TAMYRA A. TOOLE, and           )
LEON M. WILKINS,                       )
                                       )
            Appellees.                 )
_____)
                                       )
In re:                                 )
                                       )      Chapter 11
ORGANOGENESIS INC.,                    )      Case No. 02-16944-WCH
                                       )
            Debtor.                    )
_____)

**BRIEF OF APPELLANT ORGANOGENESIS INC.**

Andrew Z. Schwartz (BBO #544653)
Joshua A. McGuire (BBO #651877)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Tel.:  (617) 832-1000
Fax:  (617) 832-7000
bctnotices@foleyhoag.com

Dated: December 21, 2004

# TABLE OF CONTENTS

Table of Authorities ..........................................................................................................ii

Preliminary Statement ........................................................................................................1

Statement of Jurisdiction ...................................................................................................2

Statement of Issues Presented ...........................................................................................2

Standard of Review.............................................................................................................2

Procedural Background.......................................................................................................3

Statement of the Case.........................................................................................................3

Statement of Facts..............................................................................................................6

Summary of Argument......................................................................................................15

Argument...........................................................................................................................15

I.      Failure To Give Notice That Complies With The Technical Requirements Of The
        WARN Act Does Not Deprive An Employer From Asserting The Faltering
        Company Defense. ................................................................................................17

II.     The Termination Notice The Debtor Sent Substantially Complied With The WARN
        Act's Requirements. .............................................................................................21

III.    The Debtor's Efforts To Obtain Additional Capital Or Business Fall Squarely Within
        The "Faltering Company" Exception. ..................................................................22

Conclusion........................................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Barnett, et al. v. Jamesway Corp. (In re Jamesway Corp.)*,
   235 B.R. 329 (Bankr. S.D.N.Y. 1999) ............................................................................ 18, 19

*Childress v. Darby Lumber, Inc.*, 126 F. Supp. 2d 1310 (D. Mont. 2001) ................................... 18

*LaRoche v. Amoskeag Bank (In re LaRoche)*, 969 F.2d 1299 (1st Cir. 1992) .............................. 2

*Local 397, International Union of Electronic, Electrical, Salaries, Machine and Furniture
   Workers, AFL-CIO v. Midwest Fasteners, Inc.*, 763 F. Supp. 78, 82-84 (D.N.J. 1990) ........... 20

*In re Old Electralloy Corp.*, 162 B.R. 121 (W.D. Pa. 1993) ................................................... 20, 22

*United Paperworkers Int'l Union v. Alden Corrugated Container Corp.*,
   901 F. Supp. 426 (D. Mass. 1995) ................................................................................. 18, 19

*Wallace v. Detroit Coke Corp.*, 818 F. Supp. 192, 197-98 (E.D. Mich. 1993) ............................ 20

*Watson v. Michigan Industrial Holdings, Inc.*, 311 F.3d 760, 762-65 (6th Cir. 2002) .......... 19, 20

*Watts v. Marco Holdings*, 1998 U.S. Dist. LEXIS 4647, *2 (N.D. Miss. 1998) ......................... 19

## Statutes

28 U.S.C. § 158(a) ............................................................................................................... 2

29 U.S.C. § 2101 ................................................................................................................. 1

29 U.S.C. § 2102(b)(1) ..................................................................................................... 4, 16

29 U.S.C. § 2102(b)(3) ....................................................................................................... 17

29 U.S.C. § 2104(a) ............................................................................................................ 16

29 U.S.C. §§ 2102(a) ........................................................................................................... 3

29 U.S.C. §§ 2102(b) ........................................................................................................... 3

## Other Authorities

20 C.F.R. § 639.1(a) ............................................................................................................ 16

20 C.F.R. § 639.5(a)(1) ........................................................................................................ 16

20 C.F.R. § 639.7(d) ............................................................................................................ 17

20 C.F.R. § 639.9 ................................................................................................................. 17

20 C.F.R. § 639.9(a) ............................................................................................................ 23

Fed. R. Bankr. P. 8001(a) ..................................................................................................... 2

## Preliminary Statement

Appellant Organogenesis Inc., the reorganized debtor ("Organogenesis" or the "Debtor") in the underlying Chapter 11 case (the "Bankruptcy"), appeals the Bankruptcy Court's October 19, 2004 Order and Memorandum of Decision, in which the Bankruptcy Court overruled the Debtor's objections to 12 claims allegedly arising under the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 *et seq.* The Bankruptcy Court erroneously held that the Debtor could not assert, and, alternatively, did not satisfy, the "faltering company" defense under the WARN Act, and accordingly overruled the Debtor's objections to the proofs of claim (the "WARN Act Claims") of appellees Jane Andrews, Karen A. Giampaolo, Margaret Hirst, Dina Kazis-Panico, Hoda Mansour, John G. O'Brien, Daniel O'Reilly, Marc P. Pelletier, John C. Rodrigues, Jonathan E. Thayer, Tamyra A. Toole, and Leon M. Wilkins (collectively, the "Claimants").

As demonstrated below, this case presents a textbook illustration of the faltering company defense. Before, during, and after the 60-day notice period under WARN, the Debtor was involved in negotiations with Novartis Pharma, AG ("Novartis") to save the Debtor's troubled business. There was a realistic chance those negotiations would succeed; indeed they *did* succeed, unfortunately not before the Debtor had to close its plant (temporarily, as it turned out) and terminate a large number of employees, including the Claimants. Under the faltering company exception, an employer need not provide 60 days' advance notice of termination when it is plausible that the termination can be avoided. Here, the termination was not planned 60 days in advance, and it was not until the last minute that the Debtor knew that the Claimants would have to be terminated and sent notice of termination. In these circumstances, the Bankruptcy Court erred, as a matter of law, both in holding that the form of the notice precluded

invocation of the defense, and that the elements of the defense were not established. Accordingly, the Court should reverse the Bankruptcy Court's decision and sustain the Debtor's objection to the WARN Act Claims.

## Statement of Jurisdiction

This is an appeal from a final order of the Bankruptcy Court. Accordingly, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158(a) and Fed. R. Bankr. P. 8001(a).

## Statement of Issues Presented

1.      Whether the Bankruptcy Court erred in holding that the Debtor was precluded from asserting the faltering company defense under the WARN Act due to alleged defects in the notice of termination the Debtor provided to employees, including the Claimants.

2.      Whether the Bankruptcy Court erred in holding that notice of termination the Debtor provided to employees, including the Claimants, did not substantially comply with the requirements of the WARN Act.

3.      Whether the Bankruptcy Court erred in holding that the Debtor did not satisfy the elements of the faltering company defense, because the Debtor's chances of obtaining additional capital or financing that would have allowed the Debtor to avoid the shutdown supposedly were not realistic on July 25, 2002, 60 days before the Claimants were terminated, despite the fact that ultimately the Debtor succeeded in obtaining such financing.

## Standard of Review

According to the Bankruptcy Court, "the facts are undisputed." *See* Memorandum of Decision of the Bankruptcy Court dated October 19, 2004 ("Mem. of Decision") at 2. Insofar as this appeal presents issues of law, this Court should review the Bankruptcy Court's decision *de novo. See LaRoche v. Amoskeag Bank (In re LaRoche)*, 969 F.2d 1299, 1301 (1st Cir. 1992).

- 2-

## Procedural Background

The Debtor filed for Chapter 11 bankruptcy on September 25, 2002.  The Claimants each filed a proof of claim with the Bankruptcy Court.  In their proofs of claim, the Claimants, former employees of the Debtor, asserted entitlement to back pay and benefits based on the Debtor's alleged violation of the WARN Act in terminating the Claimants and others and closing its manufacturing facility in Canton, Massachusetts, on the eve of Bankruptcy, without sufficient advance written notice.

On August 13, 2003, the Bankruptcy Court confirmed the Debtor's Third Amended Plan of Reorganization Dated June 26, 2003 (the "Plan").  On October 28, 2003, pursuant to the Plan, the Debtor filed an objection to the WARN Act Claims on the grounds that the Debtor had valid defenses under the WARN Act.

On December 1, 2003, the Claimants filed a joint response to the Debtor's Objection, in which they alleged that the Debtor violated the WARN Act by terminating the Claimants and closing its facility in Canton, Massachusetts on September 23, 2002 without giving the 60 days' advance written notice allegedly required by the statute.  The Bankruptcy Court held an evidentiary hearing on the WARN Act Claims on April 14 and 15, 2004 (the "Hearing").

On October 19, 2004, the Bankruptcy Court issued its Order and underlying Memorandum of Decision, overruling the Objection and allowing the WARN Act Claims.  The Debtor filed its Notice of Appeal and election to proceed to District Court on October 29, 2004.

## Statement of the Case

The WARN Act, where applicable, requires an employer to provide its employees with 60 days' written notice of any plant closing, unless a statutory exception applies.  29 U.S.C. §§ 2102(a) and (b).  Absent an applicable exception, the Debtor would have had to provide its

employees with WARN Act notice on July 25, 2002, 60 days prior to the shutdown of its manufacturing facility.

One such exception is the "faltering company" defense.[1]  In order to promote and protect employers' efforts to save jobs, the WARN Act provides that:

> An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1).

As discussed in detail below, the Debtor was in financial trouble by July 2002, due in large part to an onerous marketing agreement with Novartis, pursuant to which Novartis had the sole right to market and distribute the Debtor's chief product.  Negotiations between the Debtor and Novartis regarding a fundamental change in their business relationship already had begun as of June 2002, and continued until (and beyond) September 20, 2002, when the Debtor sent a notice of termination to the Claimants and closed its manufacturing facility.  A deal with Novartis had not been reached as of September 20, 2002, and the Debtor was perilously close to running out of money.  This precipitated the shutdown and the Bankruptcy.  The negotiations with Novartis picked up again soon after the bankruptcy filing, and not long thereafter yielded an agreement in principle, which allowed the Debtor to reopen its manufacturing facility and rehire at least 60 of the skilled employees who had been terminated prior to the shutdown.  The

---

[1] At trial, the Debtor also asserted the "unforeseeable business circumstances" and "good faith" defenses under the WARN Act.  On appeal, the Debtor challenges only the Bankruptcy Court's rejection of the faltering company defense.

agreement in principle was reached in October 2002 and reduced to writing and approved by the Bankruptcy Court in November 2002. It proved to be the foundation of a successful Chapter 11 reorganization.

Throughout the negotiations with Novartis in the summer of 2002, the Debtor kept its workforce apprised of the basic problem and important developments. While the September 20, 2002 notice of termination did not specifically cite the WARN Act, and did not specifically state that the notice period was being reduced from 60 days to three and why, in the context of the information the Debtor had shared previously with its employees it was clear that the efforts to reach an agreement with Novartis had broken down, and that the Debtor would not otherwise be closing its manufacturing facility.

Based on these facts, which the Bankruptcy Court treated as undisputed, the Bankruptcy Court held that (1) the September 20, 2002 notice of termination was defective, and therefore precluded the Debtor from arguing that it was not required to send notice earlier than that date; and (2) to the extent the form of notice did not preclude the Debtor from invoking the faltering company defense, the Debtor did not satisfy the elements of that defense because its chances of successfully obtaining financing, as of 60 days before the termination, were not realistic, despite the fact that the Debtor's efforts were ultimately successful.

The Debtor challenges the Bankruptcy Court's holding that a technically deficient WARN Act notice deprives an employer of the ability to rely on a statutory defense to reduce the notice period. The Debtor also maintains that the notice the Debtor provided to the Claimants was in substantial compliance with the requirements of the WARN Act. Beyond that, the undisputed facts make out a classic faltering company defense. If the defense does not apply in these circumstances, it might as well be regarded as a dead letter.

- 5-

**Statement of Facts**

**A.    The Importance Of Organogenesis' Workers In Manufacturing Apligraf™**

The Debtor is a biomedical company whose chief product is Apligraf™, a living skin supplement used to treat venous leg ulcers and diabetic foot ulcers.  Mem. of Decision at 2.  The Debtor manufactures Apligraf™ at its facility in Canton, Massachusetts (the "Canton Facility"), using a process that is regulated by the United States Food and Drug Administration, the New York State Health Department, and various other state and federal environmental agencies.  *Id.*

Approximately 65% of the Debtor's workforce was involved in the Apligraf™ manufacturing process.  *Id.*  The manufacturing employees are highly skilled, trained, and educated.  *Id.*  Employees have science degrees, and must undergo at least three months of training before they are allowed to participate in manufacturing the product in the company's sterile "clean rooms."  (R. at 95.)[2]  The standard operating procedures for the company's clean rooms, like other procedures involved in the manufacture of Apligraf™, have been approved by the FDA, and all employees must be trained in these procedures.  (R. at 95.)

The importance of the Debtor's workforce to the production of its chief product is perhaps captured best in the statements of the employees themselves, which the Debtor's former President and Chief Executive Officer, Steven Bernitz, confirmed as true:

> Apligraf is a unique and extraordinarily complicated product to manufacture and support. …  A substantial level of knowledge, expertise, and training are necessary to manufacture Apligraf in compliance with the applicable regulations. …  Much of the knowledge and competencies necessary to produce and supply Apligraf reside in the employee population.  Each department has its own highly specialized skill set developed through years of

---

[2] Citations to the Record on Appeal will be reflected by "R." followed by the page number of the compiled record.

- 6-

> education and experience.  The value of Apligraf and Apligraf-
> related assets is dependent on employee expertise.

(R. at 236-39.); (R. at 544.) (Memo from Employees of Organogenesis to the Board of Directors,

dated September 18, 2002).

### B.  The Debtor's Contract with Novartis Pharma AG

Apligraf™ generated over 95% of the Debtor's revenue.  Mem. of Decision at 2.

Although the Debtor owned the manufacturing rights to Apligraf™, the Debtor had contracted

the exclusive world-wide marketing and distribution rights to another pharmaceutical company,

Novartis, a Swiss pharmaceutical giant.  Given the low volume of Apligraf™ that Novartis sold,

the Debtor was losing money on every sale.  (R. at 98.)  In response to this problem, the Debtor

had begun to seek potential financial and strategic partners as early as May 2002, with the

intention of raising capital or creating a partnership that could reacquire the marketing rights to

Apligraf™ from Novartis.  Mem. of Decision at 2-3.

The Debtor's management believed that reacquiring the marketing rights to Apligraf™

and pairing them with the manufacturing rights would create significant value for the company.

*Id.* at 3.  In fact, when Gary Gillheeney was hired as Vice President of Business Development

and Chief Financial Officer in May 2002, his duties included raising capital for the purpose of

buying back the marketing rights to Apligraf™, a "key initiative" for the company.  (R. at 93.)

The Debtor reaffirmed this strategy in a press release dated July 11, 2002, exactly two weeks

before the Claimants assert that a WARN Act notice should have been issued.  (R. at 100, 414.)

### C.  The Debtor's Negotiations With Novartis

On May 24, 2002, Mr. Bernitz, the Debtor's President and CEO, made a written offer to

Novartis to re-acquire the Apligraf™ marketing rights.  Mem. of Decision at 3.  On June 21,

2002, Novartis made a counter proposal to purchase the Apligraf™ manufacturing rights from the Debtor. *Id.*

On June 24, 2002, the Debtor's Board of Directors (the "Board") rejected the Novartis proposal and submitted a counter offer. *Id.* Specifically, the Debtor offered to relinquish the manufacturing rights in exchange for $35 million in cash, forgiveness of $10 million of debt, and the assumption by Novartis of $15.5 million in debt. *Id.*

On July 3, 2002, Mr. Bernitz, on behalf of the Debtor, sent a letter to Novartis with a revised proposal for the reacquisition of the Apligraf™ marketing rights. On July 11, 2002, exactly two weeks before the Debtor was required, according to the Bankruptcy Court, to issue notice pursuant to the WARN Act, the Debtor issued a press release reaffirming its strategy to reach an agreement with Novartis. *Id.*

On July 15, 2002, the Debtor's Board of Directors appointed the negotiating team of Herb Stein, Michael Baronian, and Dr. Anton Schrafl as representatives of the company authorized to negotiate with Novartis. *Id.* at 4. On July 24, 2002, the day before the Bankruptcy Court held that WARN Act notice should have been given, Mr. Bernitz presented the Board with details of a proposal to create an entity to be jointly owned by the Debtor and Novartis ("NewCo") to manufacture and sell Apligraf™. *Id.* At the same meeting, Michael Baronian, one of the negotiators, reported that the negotiating team was still trying to negotiate an agreement for the fair division of ownership between the Debtor and Novartis of the proposed NewCo, but that Novartis insisted on owning a majority share. *Id.* at 4-5. Furthermore, Mr. Baronian stated that he believed that Novartis would finance the going forward cash burn of the Debtor until an agreement was reached. *Id.* at 5.

The negotiations with Novartis continued. On August 1, 2002, Mr. Baronian reported to the Board that Novartis was insisting on owning at least 60% of the proposed NewCo, and that Novartis' lawyers were advising that the Debtor file a pre-packaged bankruptcy under Chapter 11 to confirm any Apligraf™ transaction. *Id.* at 5. At a meeting of the Board on August 28, 2002, Mr. Baronian reported an oral offer from Novartis to purchase the Apligraf™ manufacturing rights for $25 million, including $10 million in debt forgiveness and $5 million in debtor-in-possession ("DIP") financing. *Id.* He also advised the Board that his oral offer to reacquire the Apligraf™ marketing rights for $36 million had received an affirmative response from Novartis. *Id.* The Board suggested a letter be sent to confirm Novartis' willingness to sell the manufacturing rights for $36 million. *Id.*

Significantly, each of the various concepts that were negotiated with Novartis contemplated -- indeed required -- that Organogenesis remain a going concern and continue to produce Apligraf™. (R. at 105.) In its response to the Debtor's letter confirming the Novartis offer to purchase the manufacturing rights for $36 million, Novartis indicated that it would favorably consider such an acquisition provided the Debtor was actively engaged in the manufacture of Apligraf™ at the time of the proposed transaction. Mem. of Decision at 6. In an accompanying term sheet, Novartis further required:

> Prior to the closing, Organogenesis will conduct its business only in the normal and ordinary course subject to any limitations and restrictions imposed by the Bankruptcy Code, the credit facility, and the purchase agreement, and **shall use its best efforts to preserve its business intact, to retain the services of its present employees**, and to preserve the good will of its customers and suppliers.

*Id.* at 6 (emphasis added). An earlier proposal from Novartis, for the creation of a "NewCo" by Novartis and Organogenesis, included similar conditions, including "maintaining the

manufacture and supply of the product at all times," and the absence of any "material, adverse change in the business … or prospects of the business, the assets, or the product." (R. at 287-89, 550-51.)

Indeed, Novartis even took the position that a condition for the *continuation of negotiations* was that there be no material adverse changes to the Debtor. (R. at 106.) Thus, sending a WARN Act notice to employees during these negotiations would not only have had a significant detrimental effect on the possibility of raising sufficient capital to consummate a deal with Novartis, it would also have violated the terms Novartis had imposed for negotiations to continue. (R. at 106.)

Had such a notice been sent while these sensitive negotiations were ongoing, it could have destroyed the value of the product. (R. at 178.) Apligraf™ was manufactured by highly trained, high educated people who were essential to the continuation of the product. (R. at 178-179.) Rather than simply following a simple series of steps that could be reproduced in a manual, the employees manufacturing Apligraf™ applied "both science and art" to its creation. *Id*. The potential for losing the manufacturing employees was a "terrible scenario," which would have impaired the Debtor's product, its business, and its chance of consummating a transaction with Novartis. (R. at 178-79, 204.)

### D.     The Debtor's Efforts To Inform And Retain Existing Employees

Throughout the uncertain period from July through September 2002, the Debtor's employees were generally aware of the company's financial difficulties. (R. at 112.) Management held meetings with the employees and kept them informed of the negotiations with Novartis, as well as the status of the company's search for additional financing. (R. at 112, 222, 342.) The Debtor elected to keep the employees informed both because it thought that doing so

would improve morale, and because it believed that the employees had a right to know. (R. at 112, 223.)

To further combat the loss of employees due to low morale and business uncertainty, the Debtor's Board of Directors approved a retention plan for all non-executive employees in August 2002, with the objective of retaining the employees for as long as possible given the circumstances the company faced. (R. at 113, 156, 225, 503.) Pursuant to the retention plan, employees who were with the company at the time the plan was offered, and remained with the company until a transaction was completed, were to receive additional compensation equal to one month's salary. (R. at 113, 472.) Additionally, the Debtor approved a new and improved performance bonus plan. (R. at 258, 472.) These programs rewarded employees for staying with the company through a period of increased risk. (R. at 225.)

**E.    Events Leading To The Plant Closing**

**1.    Continuing Negotiations With Novartis**

Meeting minutes of the Debtor's Board of Directors for August 1, August 28, September 3, and September 6, 2002, reflect reports to the Board of ongoing, continuous efforts to reach an agreement with Novartis for the sale of the Apligraf™ marketing rights, as well as for additional financing. (R. at 501-15.) Throughout the summer, the parties went back and forth, in part due to Novartis' inability to "make up its mind." (R. at 173.) Negotiations with Novartis stretched through the month of August and into September. (R. at 154-70.) At a meeting of the Board on September 3, 2002, Mr. Baronian reported that Novartis had set a deadline of September 30, 2002, for the Debtor to complete the purchase of the Apligraf™ marketing rights for $36 million.

On September 9, 2002, with its predicament having deteriorated, the Debtor ceased production of Apligraf™ and furloughed its employees, effectively causing them to take an

"involuntary vacation." (R. at 232-33, 541-42.) The memorandum to all employees, informing them of the furlough, provided the employees with an update on the state of the discussions with Novartis, and the impact such ongoing negotiations had on the employees. (R. at 541-42.)

This step was taken to reduce the Debtor's liability for unpaid employee vacation time and because the company was running out of money; the furlough constituted a "last-ditch effort" to conserve cash and attempt to complete a deal for refinancing with Novartis. (R. at 205, 210-15, 233.) At the time it was initiated, however, the Debtor did not intend for the furlough to result in the termination of the employees. (R. at 267-68.) In fact, on September 16, 2002, Mr. Bernitz sent an additional memo to the Debtor's employees, further updating them on the status of the negotiations with Novartis, and emphasizing that this furlough was not simply a "mass lay-off," but rather that the Debtor was committed to keeping the facility ready to resume production in the event an agreement could be reached. (R. at 235, 543.)

In early September, the Debtor's efforts to raise capital were, in part, successful. In response to a request from the Debtor, Novartis provided Organogenesis with over a million dollars in cash. (R. at 172, 233-34.) This payment was on account of product that had been delivered to Novartis, but for which payment was not yet due, or was disputed. (R. 172-73, 233, 272.) Organogenesis had urged Novartis to make this payment as a showing of good faith, in light of the condition of the company, and Novartis agreed. (R. at 172-73.) As a condition of the agreement to pay Organogenesis this money, Novartis required that representatives of the Debtor attend a "crucial" meeting with Novartis and its attorneys, including key personnel sent from Novartis headquarters in Switzerland, on September 13, 2002. (R. at 173-74, 266, 295, 569-72.) In light of the inconsistent positions taken by Novartis in the negotiations throughout the

summer, the Debtor hoped that the presence of the key decision-makers at this meeting would enable the parties to reach agreement quickly. (R. at 173, 266.)

The Debtor's optimism was bolstered by Novartis' plan to open a large research and development facility in Cambridge, Massachusetts. (R. at 177, 252-53, 300-01, 577-82.) Given its imminent arrival in the Debtor's backyard, Novartis indicated to the Debtor that it would "bend over backwards" to avoid any bad publicity associated with the perception that Novartis had "squashed" a small local company with an important and dynamic product. (R. at 177-78, 252-53, 300-01.) Novartis' sensitivity to its public image was yet another reason that sending a WARN Act notice to the Debtor's employees in the midst of these negotiations could have derailed the process; Novartis did not want to be associated with the adverse publicity that would have been generated by a large-scale notice of imminent termination. (R. at 179.)

At the September 13, 2002 meeting in New York, which occurred ten days before the termination of the Claimants, the Debtor made a proposal to Novartis, and Novartis communicated directly with third parties with whom the Debtor had been in contact regarding the possibility of a deal involving one of those third parties. (R. at 179.) At the conclusion of the September 13 meeting, Novartis' representatives indicated that they had concerns about completing a deal with these third parties, but indicated that they would continue discussions to see if there was any way to do a deal with either of those entities. (R. at 180.) Novartis also entertained the Debtor's proposal, but did not respond to it at the September 13 meeting. (R. at 180.)

During the period from September 13, 2002 to September 20, 2002, five days before the Debtor filed for bankruptcy, there was further contact between the parties, but no deal was reached. (R. at 180.) Primarily as a result of its declining cash position, the Debtor

unfortunately was forced to close normal operations at its manufacturing facility on September

23, 2002, and terminate the vast majority of its employees.  (R. at 245, 581-82.)

In its notice of termination, the Debtor provided additional information to the employees

about the negotiations with Novartis, noting that it was "following up" with the employees

regarding the current state of the company.  The notice stated:

> We have worked extremely hard to come to an agreement with
> Novartis over the future of the Apligraf.  Unfortunately, Novartis is
> no longer interested in purchasing Organogenesis' manufacturing
> rights and assets and has cut off all negotiations of a settlement of
> our longstanding disputes.  We are therefore terminating our
> relationship with Novartis and will file for Chapter 11 bankruptcy
> protection in the next few days.

(R. at 582.)  In the context of the previous communications from management, this notice

provided the employees with a clear explanation for the sudden need to close the manufacturing

location and terminate the employees.[3]

### 2.    Agreement Reached Between the Debtor and Novartis

Very shortly after the Debtor filed for bankruptcy, the negotiations with Novartis finally

did yield an agreement, which was approved by the Bankruptcy Court in November 2002.  Mem.

of Decision at 10.  The agreement with Novartis resulted in the reopening of the Canton

manufacturing facility, the rehiring of at least 60 of the skilled employees who had been

---

[3] In fact, just two days before the Debtor issued its notice of termination, the employees
themselves had sent a memo to management, urging the company to resolve its dispute with
Novartis.  (R. at 544-45.)  The memo reflects a sophisticated understanding of the critical
importance of the Debtor's highly-skilled workforce to its operations, as well as the destabilizing
effect the loss of such employees would have on company operations.  *Id.*  Even more
significantly, the memo demonstrates that the employees understood that the company's
financial instability had the effect of making it difficult to retain this vital workforce.  *Id.*  In light
of the Debtor's efforts to keep the employees apprised of the ongoing negotiations with Novartis,
it is clear that the employees were generally aware that the Debtor was in a faltering company
mode.

terminated on September 23, 2002, and the return of Apligraf™ to the market. *Id.*; (R. at 275.)
Thus, the Debtor's optimism that a deal eventually could be reached proved to be correct,
although the Debtor was not able to predict the precise ebb and flow of events that eventually
would culminate in the agreement.

## Summary of Argument

1.      The Bankruptcy court erred in holding that an employer may not assert defenses
under the WARN Act where the notice of termination is technically deficient.  The decisions
cited by the Bankruptcy Court in support of its decision on this point either do not depend on this
rule in reaching their outcome, or are otherwise unpersuasive.  Several courts have allowed an
employer to rely on WARN Act defenses where notice was technically flawed, and policy
considerations support this result.

2.      Viewed in context, the notice the Debtor sent was in substantial compliance with
the statute.

3.      The Bankruptcy Court erred in holding that the Debtor did not meet the elements
of the faltering company defense.  The Bankruptcy Court was simply wrong in finding that there
was no "realistic" chance that the Debtor would succeed in its attempts to raise additional capital
to avoid or postpone the shutdown.  The undisputed facts regarding the Debtor's ongoing
negotiations with Novartis toward an agreement that would save the faltering company, and the
fact that those negotiations did succeed, compel the conclusion that the Debtor's chances of
obtaining additional capital were highly realistic.

## Argument

The Bankruptcy Court correctly noted that the WARN Act, as the acronym suggests, is a
notice provision.  As a general matter, the WARN Act "provides protection to workers, their

- 15-

families and communities by requiring employers to provide notification 60 calendar days in

advance of plant closings and mass layoffs." 20 C.F.R. § 639.1(a). "Advance notice provides

workers and their families some transition time to adjust to the prospective loss of employment,

to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will

allow these workers to successfully compete in the job market." *Id.*

Accordingly, "notice must be given at least 60 calendar days prior to any **planned** plant

closing or mass layoff." 20 C.F.R. § 639.5(a)(1) (emphasis added). Generally, if an employer

fails to comply with the 60-day notice requirement, the employer is liable to each terminated

employee for back pay and benefits for each day in violation of the WARN Act. 29 U.S.C. §

2104(a). The statutory notice period may, however, be reduced pursuant to certain defenses

enumerated in the statute, including the "faltering company" defense:

> An employer may order the shutdown of a single site of
> employment before the conclusion of the 60-day period if as of the
> time that notice would have been required the employer was
> actively seeking capital or business which, if obtained, would have
> enabled the employer to avoid or postpone the shutdown and the
> employer reasonably and in good faith believed that giving the
> notice required would have precluded the employer from obtaining
> the needed capital or business.

29 U.S.C. § 2102(b)(1).

The Application of the WARN Act and its defenses is inherently an exercise in hindsight.

The statute requires the Court to count back 60 days from the September 23, 2002 plant closing

and determine, as of July 25, 2002, whether the Debtor should have given notice of the event

which, with 20-20 hindsight, we now know lay in its future. The Debtor here was not planning a

shutdown as of July 25, 2002; on the contrary, it was doing everything in its power to avoid one.

Nor is this a case in which an employer suddenly and permanently shut the doors to a place of

employment without any warning whatsoever. The Debtor's employees were painfully aware of

- 16-

the Debtor's struggles and its attempts to remedy them, attempts which, notwithstanding the shutdown in late September, eventually met with success and allowed the Debtor to rehire 60 of its skilled workers.  When it became apparent several days before the shutdown that, despite its extensive efforts, the Debtor could not avoid closing its doors, the Debtor formally notified the Claimants and others of the termination of their employment.  As demonstrated below, both the form and the timing of the notice were sufficient under the statute to curtail liability.

I.      **Failure To Give Notice That Complies With The Technical Requirements Of The WARN Act Does Not Deprive An Employer From Asserting The Faltering Company Defense.**

The WARN Act provides that, where a statutory defense applies, an employer is required to "give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period."  29 U.S.C. § 2102(b)(3); *see also* 20 C.F.R. § 639.9.  Thus, if an employer is excused from providing any notice to employees until three days before a plant closing, and then provides notice of the plant closing as well as "a brief statement of the basis for reducing the notification period," the employer may avoid all liability under the WARN Act.

Here, the Debtor did provide notice of termination three days prior to the plant closing, and that notice did meet many, if not all, of the formal requirements of a WARN Act notification (*compare* 20 C.F.R. § 639.7(d) (requirements of notice) *with* (R. at 581-82.) (September 20, 2002 Memorandum from Steven Bernitz to All Employees)).[4]  The Bankruptcy Court, however, singled out the notice's failure to provide the employees with a brief statement of the basis for reducing the notification period and held that this omission barred the Debtor from even raising the faltering company defense.

---

[4] The notice's substantial compliance with the statutory requirements is discussed in Section II of the Argument, below.

In support of this conclusion, the Bankruptcy Court relied on this Court's decision in *United Paperworkers Int'l Union v. Alden Corrugated Container Corp.*, 901 F. Supp. 426 (D. Mass. 1995), as well as three decisions from other courts.[5] In *United Paperworkers*, this Court noted in dicta that, because the defendants had failed to give *any* written notice of the shutdown of a two manufacturing plants, their "entitlement to rely upon [the faltering company and other] defenses at all [was] open to question." *United Paperworkers*, 901 F. Supp. at 440. Because the Court went on to hold that the WARN Act defenses were inapplicable to the facts before it, the Court declined to address this question: "[I]n the circumstances of this case, [the issue] need not be resolved." *Id.* Similarly, in *Barnett, et al. v. Jamesway Corp. (In re Jamesway Corp.)*, 235 B.R. 329 (Bankr. S.D.N.Y. 1999), the court's statement that an employer who failed to give WARN Act notice "cannot assert the … 'faltering company' exception to the Act as a defense to liability" was arguably dicta because the court concluded, after examining the merits of the defense, that it did not apply. *See Jamesway*, 235 B.R. at 342-43. A third decision cited by the Bankruptcy Court, *Childress v. Darby Lumber, Inc.*, 126 F. Supp. 2d 1310 (D. Mont. 2001), also concluded that WARN Act defenses were unavailable to the employer due to inadequacy of notice while holding that the faltering company defense was inapplicable on the merits. 126 F. Supp. 2d at 1317. The results in these cases did not depend on the application of the rule for which the Bankruptcy Court cited them.

Even if the *United Paperworkers* court had properly reached the issue and held that the defendants there were not entitled to assert the WARN Act defenses, that decision would still be distinguishable from these facts, as the employer in *United Paperworkers* failed to give any

---

[5] None of these four cases was cited in the Claimants' briefs or at trial, and the Debtor has not previously addressed the applicability of these decisions to the facts before the Court.

written notice of termination whatsoever. *See United Paperworkers*, 901 F. Supp. at 431-32; *see also Jamesway*, 235 B.R. at 337 (although Jamesway alleged that its security guards had distributed WARN notices to some plaintiffs, the company was unable to produce a copy of the notice and did not attempt to prove its contents); *Watts v. Marco Holdings*, 1998 U.S. Dist. LEXIS 4647, *2 (N.D. Miss. 1998) (defendants "failed to give any notice at all"). Here, the Debtor did give written notice to its employees addressing the cause of their termination, and that notice followed a series of communications from the company, designed to keep the employees apprised of the Debtor's status.

Several other courts have eschewed the broad rule proposed by the Bankruptcy Court here, *i.e.*, that the failure to provide flawless WARN Act notice bars all statutory defenses. In *Watson v. Michigan Industrial Holdings, Inc.*, 311 F.3d 760, 762-65 (6th Cir. 2002), the Sixth Circuit permitted an employer to assert the "unforeseeable business circumstances exception," one of the other defenses under the WARN Act, where no written notice had been given other than a posted notice announcing "the immediate and permanent closing" of the manufacturing facility. 311 F.3d at 761. Without any discussion of the sufficiency of such cursory notice, the Sixth Circuit held that the unforeseeable business circumstances applied, noting that:

> WARN was not intended to force financially fragile, yet economically viable, employers to provide WARN notice and close its [*sic*] doors when there is the *possibility* that the business may fail at some undetermined time in the future. Such a reading of the Act would force many employers to lay off their employees prematurely, harming precisely those individuals WARN attempts to protect. A company that is struggling to survive financially may be able to continue on for years and it was not Congress's intent to force such a company to close its doors to comply with WARN's notice requirement.

*Watson*, 311 F.3d at 765 (emphasis in original).

- 19-

Similarly, in *In re Old Electralloy Corp.*, 162 B.R. 121, 126 (W.D. Pa. 1993), the court allowed the employer to rely on the faltering company exception where notice had consisted only of "[t]he Debtor post[ing] a TERMINATION NOTICE to its Bishop Tube employees announcing that at the close of business on that date, Bishop Tube would cease operations." 162 B.R. 122, 124-26. In that court's view, "[a]s long as the Debtor's management had a reasonable prospect of securing either additional loan money or a capital investment, it is unreasonable to expect a 60 day notice of plant closing to have been given, since that would have foreclosed the possibility of staying open." *Id.* at 125-26. Other courts have also analyzed WARN Act defenses in circumstances where notice has been absent or deemed insufficient, rather than refusing to allow employers to assert the defenses in such cases. *See Local 397, International Union of Electronic, Electrical, Salaries, Machine and Furniture Workers, AFL-CIO v. Midwest Fasteners, Inc.*, 763 F. Supp. 78, 82-84 (D.N.J. 1990); *Wallace v. Detroit Coke Corp.*, 818 F. Supp. 192, 197-98 (E.D. Mich. 1993).

As these decisions make clear, the rule adopted by the Bankruptcy Court is not universally applied, and is not the better approach. The failure to provide a "brief statement" of the statutory reasons for delaying notice of a plant shutdown should not compel a court to ignore the sound basis an employer had for delaying such notice. Depriving the Debtor of the faltering company defense on these grounds is especially unfair given that the Debtor kept its employees informed of its ongoing negotiations with Novartis, a subject that was again mentioned in its termination notice to employees. The Debtor's approach provided more notice to its employees than they would have received had the Debtor reserved its entire explanation for reducing the notice period until the termination memo three days before the plant closing. Applying the WARN Act as woodenly as the Bankruptcy Court did below would do nothing to promote the

WARN Act's goal or treat employers fairly.  Other courts have allowed employers who had

similar, or greater, lapses under the statute's technical requirements to rely on the statutory

defenses, and this Court should follow their example.

## II.     The Termination Notice The Debtor Sent Substantially Complied With The WARN Act's Requirements.

The Bankruptcy Court stated, incorrectly, that the Debtor admitted that "no WARN Act

notice was ever given to its employees."  Mem. of Decision at 17.  In fact, as the Claimants

themselves acknowledged, the Debtor only admitted, in the parties' joint pre-trial statement, that

"the Debtor gave no notice to the Claimants *specifically* pursuant to the WARN Act of the

termination of their employment."  (R. at 613.) (Post-Trial Brief of the WARN Act Claimants)

(emphasis added).  By admitting that the notice of termination sent to its employees did not

specifically reference the WARN Act or its statutory requirements, the Debtors did not admit

that no notice of termination was given to its employees on September 20, 2002, or that such

notice did not substantially comply with the requirements of the WARN Act.

It is apparent from the text of the termination notice, particularly in light of the Debtor's

other communications to its employees, that the Debtor *did* provide information that amounted to

a brief statement of the basis for reducing the notification period, as the WARN Act and the

regulations require.  (R. at 582.)  In the context of the stream of information provided to the

employees during the summer of 2002, the termination notice makes clear that the failure of the

negotiations with Novartis was the ultimate cause of the plant closing, that the shutdown was not

a planned event, and that the Debtor had been seeking additional capital which, if obtained,

would have enabled the Debtor to postpone or avoid the shutdown of the Canton Facility.

Providing such information amounts to substantial compliance with the statute.

III.    **The Debtor's Efforts To Obtain Additional Capital Or Business Fall Squarely Within The "Faltering Company" Exception.**

This case is a paradigmatic example of the faltering company exception. From no later than June 2002 through September 20, 2002 (and in fact continuing thereafter), the Debtor was engaged in the constant pursuit of additional capital, critical marketing rights, or a new business arrangement that would have allowed its Apligraf™ manufacturing operations to continue uninterrupted. Because the production of Apligraf™ requires a workforce with a specialized set of skills, training, and experience gained over time, no prospective business partner would have been willing to provide the necessary additional capital or business if the continuity of the Debtor's workforce had been threatened.

The Debtor's uniquely qualified manufacturing team would almost certainly have suffered crippling losses if, on July 25, 2002, the Debtor had informed its employees that they would be terminated in 60 days; employees would have been given a powerful impetus to leave, and to leave soon.[6] Simply put, without the employees, there would be no product; without the product, there would have been nothing to invest in; and without an investment, the company and its literally life-saving product were going to die. In these circumstances, the law does not require an employer to sacrifice its future on the altar of the WARN Act's notice requirements, and does not punish it for failing to send such a notice while it has reasonable prospects of resurrecting itself. *See In re Old Electralloy Corp.*, 162 B.R. 121, 125-26 (W.D. Pa. 1993) ("As long as the Debtor's management had a reasonable prospect of securing either additional loan money or a capital investment, it is unreasonable to expect a 60 day notice of plant closing to have been given, since that would have foreclosed the possibility of staying open.").

---

[6] As stressed above, the Debtor had no expectation as of July 25 that it would be terminating the Claimants on September 23.

- 22-

The Bankruptcy Court noted that, in order for the Debtor to assert the faltering company defense successfully, the regulations require (1) that it identify specific actions taken to seek new capital or business at the time when the 60-day notice would have been due; (2) that the Debtor must have had a realistic opportunity to obtain the sought after financing or business; (3) that such financing or business sought must have been sufficient, if obtained, to postpone or prevent the plant closing; and (4) that the Debtor had to believe reasonably and in good faith that giving the required termination notice would have precluded the ability to obtain the needed financing or business. Mem. of Decision at 15, *citing* 20 C.F.R. § 639.9(a). The Debtor amply satisfied each of these criteria.

The Bankruptcy Court indeed acknowledged that, as of July 25, 2002, "it is clear the Debtor was seeking new capital," Mem. of Decision at 15; "if negotiations between the Debtor and Novartis had not failed, the Debtor could have avoided or postponed closing the Canton facility," *id.* at 16; and "[the] Debtor did have a reasonable and good faith basis to believe that providing its employees with WARN Act notice as early as July 25, 2002 would have caused a loss of skilled employees and resulted in the further breakdown of negotiations with Novartis," *id.* at 17.[7] Thus, each of these elements of the faltering company defense unquestionably were met.

Against the overwhelming weight of the undisputed evidence, however, the Bankruptcy Court also concluded that, as of July 25, 2002, the earliest date on which the Debtor would have had to give notice under the statute, there was "no realistic chance" of the Debtor obtaining the

---

[7] As emphasized throughout this brief, any "failure" of the negotiations with Novartis was only temporary; in time, the negotiations were quite successful.

necessary financing from Novartis.  This conclusion is simply unsupportable, as both the contemporaneous evidence and subsequent history confirm.[8]

To support its conclusion, the Bankruptcy Court noted that, in a letter to the Debtor, dated July 17, 2002, Novartis "clarified" that negotiations concerning the Debtor's reacquisition of the Apligraf™ marketing rights had been terminated prior to July 11, 2002.  *Id.*  In fact, this posturing was untrue; within one week, Novartis was back at the negotiating table, remained there until September 20, and returned again after the Debtor filed for bankruptcy on September 25.  The Bankruptcy Court's reliance on this one statement, lifted out of the months-long negotiation, is an example of the perils of hindsight, selectively applied.  The statement is also undercut by the continuum of undisputed facts that ensued.  Whether it was sincere or not at the time, Novartis's July 17 assertion was overcome by events.  The Bankruptcy Court should have recognized it for what it was: a negotiating ploy consistent with the pressure tactics that are common in such business negotiations.

Of course, negotiations between the parties continued after July 17 without any material hiatus.  At a Board meeting on July 24, 2002, 61 days prior to the plant closing, Michael Baronian reported that the negotiating team, which had been created on July 15, 2002, was still trying to negotiate an agreement for the fair division of ownership between the Debtor and Novartis of the proposed NewCo, but that Novartis insisted on owning a majority share.  Furthermore, Mr. Baronian stated that he believed that Novartis would finance the going forward cash burn of the Debtor until an agreement was reached.  The negotiations were very much alive in late July, and remained ongoing, albeit with fits and starts, for three to four months thereafter.

---

[8] To the extent that this Court treats the Bankruptcy Court's conclusion that the Debtor had no realistic chance of striking a deal with Novartis as a finding of fact, the Debtor submits that the evidence demonstrates that the conclusion was clearly erroneous.

As Novartis itself indicated to the Debtor during the negotiations, it desired to reach an agreement with the struggling company, if for no other reason than to avoid the public relations fallout that would be associated with driving the Debtor out of existence. As the newest corporate resident of Cambridge, Novartis could ill afford such a debacle. Furthermore, Novartis appeared willing to negotiate, as it spent time and energy crafting lengthy proposals and counter-proposals, and participating in extensive conference calls. In light of this information, it cannot be said that it was unrealistic of the Debtor to believe between July 25 and September 20 that an agreement with Novartis could be reached without the necessity of a plant shutdown, especially given the extensive negotiations with Novartis that both preceded and followed this time period.

Further, although the Bankruptcy Court acknowledged the fact that, ultimately, the Debtor was able to strike a deal with Novartis, it failed to appreciate how that validated the Debtor's belief that it had a realistic chance of doing so. Novartis and the Debtor reached an agreement in principle within a month after the bankruptcy was filed that allowed the Debtor to acquire the marketing rights to Apligraf™ and restore its manufacturing operations. The Bankruptcy Court's conclusion that, as of a particular day in the middle of a negotiation that lasted for several months before finally succeeding, it was unrealistic for the Debtor to believe that an agreement could be reached, simply defies logic and common sense.

The Bankruptcy Court's decision is particularly perplexing given the Bankruptcy Court's acknowledgement that the agreement with Novartis itself constitutes good evidence that, had an agreement been reached, the closure of the Debtor's manufacturing facility could have been avoided. Based on the post-bankruptcy agreement with Novartis, the Bankruptcy Court correctly found that, "if negotiations between the Debtor and Novartis had not failed, the Debtor could have avoided or postponed closing the Canton Facility." Mem. of Decision at 16. In so doing,

the Bankruptcy Court specifically rejected the Claimants' argument that the agreement between the Debtor and Novartis could not be used to establish, objectively, that if a deal had been reached prior to the closure of the Canton Facility, the shutdown would have been avoided. Mem. of Decision at 16, n. 12.  The Bankruptcy Court noted that "[t]he fact that the Debtor was able to resume production and rehire approximately one-half of the terminated employees upon the consummation of a deal with Novartis is indeed the **best evidence** that a pre-closure deal would have avoided a shutdown."  *Id.* (emphasis added).  That the agreement was reached is also the "best evidence" that the Debtor was realistic in believing one could be reached.

Thus, the undisputed facts support the conclusion that the Debtor met all the elements of the faltering company defense under the WARN Act.  Additionally, the Debtor took steps throughout its struggles to keep its employees notified of the company's problems, and its quest for solutions.  The fact that, when the Debtor was compelled to close its manufacturing facility despite its extensive efforts, the notice of termination sent to the Claimants did not include the words "WARN Act" or "notification period" should not reduce an otherwise viable defense to a legal nullity.  The faltering company exception exists to protect employers in these circumstances.  A more compelling demonstration of the defense is difficult to imagine.

## Conclusion

For the reasons set forth above, the decision of the Bankruptcy Court should be reversed, and the case should be remanded with the instruction that the Bankruptcy Court enter an order sustaining the Debtor's objection to the WARN Act Claims.

Respectfully submitted,

ORGANOGENESIS INC.,

By its attorneys,


/s/  Joshua A. McGuire
Andrew Z. Schwartz (BBO #544653)
Joshua A. McGuire (BBO #651877)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Tel.:  (617) 832-1000
Fax:  (617) 832-7000
bctnotices@foleyhoag.com

Dated: December 21, 2004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ORGANOGENESIS INC.,                     )
                                        )
              Appellant,                )
       v.                               )      Case No. 04-CV-12549-RWZ
                                        )
JANE ANDREWS, KAREN A. GIAMPAOLO,       )
MARGARET HIRST, DINA KAZIS-PANICO,      )
HODA MANSOUR, JOHN G. O'BRIEN,          )
DANIEL O'REILLY, MARC P. PELLETIER,     )
JOHN C. RODRIGUES, JONATHAN E.          )
THAYER, TAMYRA A. TOOLE, and            )
LEON M. WILKINS,                        )
                                        )
              Appellees.                )
_____)
                                        )
In re:                                  )
                                        )      Chapter 11
ORGANOGENESIS INC.,                     )      Case No. 02-16944-WCH
                                        )
              Debtor.                   )
_____)

## CERTIFICATE OF SERVICE

I, Joshua A. McGuire, hereby certify that, on this the 21st day of December, 2004, I caused true and accurate copies of the following:

1. Brief Of Appellant Organogenesis Inc.; and

2. this Certificate Of Service

to be delivered to:

Kevin B. Callanan, Esq.
17 Accord Park Drive, Suite 101
Norwell, MA  02061

by facsimile and by first-class mail, postage prepaid.

Respectfully submitted,


/s/  Elizabeth A. Amoroso
Elizabeth A. Amoroso
Paralegal
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Tel.:  (617) 832-1000
Fax:  (617) 832-7000

Dated: December 21, 2004